## CALDWELL v. LAUREL GROVE CO., Inc. (MORGAN'S LOUISIANA & TEXAS R. & S. S. CO., Intervener).

### No. 945.

Court of Appeal of Louisiana. First Circuit.

March 8, 1932.

Borah, Himel & Bloch, of New Orleans, for appellant.

Brumby & Bauer, of Franklin, for appellee.

ELLIOTT, J.

Vernon L. Caldwell, holder and owner of a note for $50,000 secured by special mortgage granted by Laurel Grove Company, Inc., on Laurel Grove plantation, together with the sugar house, machinery, buildings, and improvements of every nature and kind situated thereon and forming part thereof, sued out executory process under his mortgage, in the execution of which the property covered by the mortgage was seized and advertised for sale to pay the amount due on said note. A number of creditors of Laurel Grove Company, Inc., intervened, and filed third oppositions, claiming a vendor's privilege, on property that had not been paid for.

We have to do with one filed by Morgan's Louisiana & Texas Railroad & Steamship Company. This railroad and steamship company intervened and opposed the payment to the plaintiff of the proceeds of a lot of rail, angle bars, track bolts, nut locks, track spikes, tie plates, one frog, split switch complete, low star switch, and two guard rails complete, things used in the construction of a railroad and which it had sold and delivered to Laurel Grove Company, Inc., for the aggregate price and sum of $1,851.25. It alleges in its petition of intervention and third opposition that, said property not having been paid for, a vendor's privilege exists thereon in its favor. It prayed that said property be separately appraised, separately sold, and that the amount due it on said account be paid out of the proceeds by privilege and preference over said Caldwell.

Caldwell in his answer denies that intervener and third opponent is a creditor of Laurel Grove Company, Inc., as alleged; admits that said railroad and steamship com-

pany sold and delivered the articles mentioned to Laurel Grove Company, Inc., and that same has not been paid for, but denies that a vendor's privilege exists thereon. He avers that the articles in question were used by Laurel Grove Company, Inc., in the construction of switches on Laurel Grove plantation, connecting with the Texas & Pacific Railroad. That said switches so constructed and operated form a part of said plantation, are immovable by nature and destination, and that no vendor's privilege exists thereon. He prays that the demand of intervener and third opponent for recognition of a vendor's privilege on said articles in its favor be refused and rejected.

There was judgment in the lower court in favor of the railroad and steamship company against Laurel Grove Company, Inc., for $1,851.25, with 6 per cent. per annum interest thereon from October 30, 1926, until paid, and against said Caldwell recognizing and enforcing the vendor's privilege claimed by said railroad and steamship company on the articles described in its petition, and the sheriff of the parish of Lafourche was ordered to pay over the proceeds of the same to intervener and third opponent by privilege and preference over said Caldwell.

The plaintiff Caldwell has appealed.

The evidence shows that Laurel Grove Company, Inc., owns and operates the Laurel Grove plantation, together with the sugar house, machinery, buildings, and improvements of every kind and nature situated thereon. That Morgan's Louisiana & Texas Railroad & Steamship Company on or about October 30, 1926, sold and delivered to Laurel Grove Company, Inc., the property described as follows, to wit:

| | | |
|---|---|---|
| 3800' | 75 # rail S H 42, 411 GE at 33.00 | $1,399.56 |
| 254 | 73 # angle bars 5,080# at .22 Lb | 111.76 |
| 508 | Track bolts ¾ X 4⅛# 508 at .444 | 22.56 |
| 508 | Nut locks at .0248 ea. | 12.60 |
| 12 | Kegs track spikes S H .2400 # at .01735 lb | 41.64 |
| 300 | Tie plates 75# S. H. at .0986 | 29.58 |
| 1 | New # 7 90# Rigid frog at 75.88 ea | 75.88 |
| 1 | New 15'' 80# split switch complete | 78.53 |
| 2 | New 80# Guard rails complete at 29.45 ea | 58.90 |
| 1 | Low star switch stand | 20.24 |

amounting in the aggregate to $1,851.25; representing which a note was given, and Laurel Grove Company, Inc., owner and possessor of Laurel Grove plantation used same in the construction of railroad switches on its said plantation. Laurel Grove Company, Inc., had already constructed a roadbed and had placed cross-ties on it in position to receive these rails, etc., and, upon receiving the steel in question, using its own labor, Laurel Grove Company, Inc., constructed on its said plantation two switch tracks, the two tracks together being about 3,800 feet in length, the same lengthening the existing Texas & Pacific railroad tracks to that extent.

The steel bought from intervener and third opponent and used in the construction of said railroad was not paid for. The privilege claimed by intervener and third opponent exists, unless it was extinguished by the use made of the things in the construction of a railroad on the plantation, becoming part of it, immovable by nature.

The facts are correctly stated by intervener and third opponent. We copy from its brief as the basis for the conclusion at which we have arrived: "The identity of the property seized with that sold by the railroad company on a credit, was conclusively established. And it was further shown that this property could be removed from the roadbed (ties and dump) very easily and without appreciable cost, as compared with its value. That it was secondhand rail when sold; that it would not be junk if removed from the ties on Laurel Grove Plantation, but would be substantially the same as when it was bought from the railroad company. That the dump or roadbed on which the rail had been placed had been built prior to the purchase of the rail and was a separate and distinct thing. That if the rails were removed from the ties, the plantation would suffer no material injury and that Laurel Grove plantation would in fact be in identically the same condition after such removal of the rails as it was when the rails and switch material was bought. That the switches were in no sense a necessary part of the plantation, the plantation having operated its sugar house for many years without them and having installed them purely as convenience for a third person who was buying its bagasse."

The articles of the Civil Code governing in the matter are as follows:

"Immovable things are, in general, such as can not either move themselves or be removed from one place to another. But this definition, strictly speaking, is applicable only to such things as are immovable by their own nature, and not to such as are so only by the disposition of the law." Article 462.

"There are things immovable by their nature, others by their destination, and others by the object to which they are applied." Article 463.

"Lands and buildings or other constructions, whether they have their foundations in the soil or not, are immovable by their nature." Article 464.

"The ownership of a thing, whether it be movable or immovable, carries with it the

right to all that the thing produces, and to all that becomes united to it, either naturally or artificially. This is called the right of accession." Article 498.

"All that which becomes united to or incorporated with the property, belongs to the owner of such property, according to the rules hereafter established." Article 504.

"Privileges become extinct: By the extinction of the thing subject to the privilege." Civ. Code, art. 3277.

A standing crop, the fruit of a tree not gathered, and the tree itself, while standing, are immovable by nature; they are considered as part of the land to which they are attached.

The lower court in a written opinion has entered closely into the case, citing authorities, and able counsel on each side have done likewise, court and counsel contending that decisions of the Supreme Court support their respective positions.

We will not undertake to discuss all the decisions and authorities upon which reliance is placed. The articles of the Civil Code have been studied by the Supreme Court and applied in a way which shows how the court has understood and endeavored to enforce the law to which we have referred. The difference that distinguishes some of them may be disputed; yet the real boundary at which the vendor's privilege stands or ceases to exist can, we believe, be reasonably well perceived.

In Lapene & Jacks v. McCan & Son, 28 La. Ann. 749, the report of the case shows that boilers had been sold to Lapene & Jacks and not paid for. The purchasers erected them in their sugar house, attaching them thereto, for its service. The vendor claimed his privilege. The privilege was not resisted, it was recognized by a judgment of the court, but it was contended that the boilers could not be sold under a separate appraisement, separate from the sugar house; that boilers and sugar house must be sold together. The right to the privilege having been recognized by judgment, the court held that it could be enforced by the removal and separate sale of the boilers. The question whether the boilers had become immovable by nature or not does not appear, and the court said nothing on that subject. This case does not seem to have any pertinent bearing on the question to be determined in the present case.

In Carlin, Administrator v. Gordy, Sheriff, 32 La. Ann. 1285, a sugar mill and machinery had been sold and not paid for. The mill and machinery had been erected on a sugar plantation and thereby converted, so the court said, into an immovable by destination. A creditor having a special mortgage on the plantation contended that the privilege was thereby extinguished. The court held that the mill and machinery could be removed

without damage to the sugar house and also further said: "The privileges resting upon movables are, in some cases, affected by the changes which may take place in the nature or destination of the things. But such changes must be so radical as to create a new species of thing and destroy that species which originally existed—as, to use the illustration of Cujas, when a pine or cypress log is converted into a ship, or when wool is converted into a garment, or when marble is made into a statue." Continuing, the court further said: "The mill and machinery have suffered no such change by the use which the vendee has made of them. They remain the mill and machinery which were sold; and the privilege subsists in all its force. Had their destination as immovables been effected in such manner as to preclude their detachment without injury to independent rights of ownership in the soil or structures, the privilege might have been subjected to such limitation in its exercise as would prevent the separate sale or removal of the thing subjected to it. But where, as in this case, no such difficulty exists, or, if at all, to an inappreciable extent, we see no reason for imposing any restriction upon the rights of the privileged creditor."

The court recognizes in this case that it is the creation of the things sold, into a new species of thing, that extinguishes the vendor's privilege. The opinion was unanimous, and the reasoning of the court has never been departed from.

In connection with the illustration stated above, what appears to be an excerpt has been furnished us by counsel, which we translate from the French, as follows: "There results from these distinctions and these developments, that the important point is to distinguish whether the thing has ceased to be what it was, in order to transform itself into a different species, or whether it has only received some ameliorations or diminutions which have not prevented it from preserving its original species." The book from which the above language was taken, not having been given, we would not quote it in the case were it not that it is almost the same illustration as that stated in the opinion just referred to.

In Swoop v. St. Martin, 110 La. 237, 34 So. 426, 427, the court, enumerating a number of parts which Swoop, the owner of a foundry, had used in replacing and repairing certain sugar equipment and machinery, in acting on a vendor's privilege claimed by him and resisted by Sarpy having a special mortgage on the immovable, who insisted that the vendor's privilege had been extinguished in the way claimed in the present case, used the following language: "Whether these things became so incorporated into the sugar mill of defendant as to lose their identity, is the question. Our jurisprudence is not in a

very satisfactory condition on the subject of when movables become, with respect to the vendor thereof, so incorporated with the soil as to lose their character of movables. * * * If lumber goes into the construction of a house, it evidently loses its identity. So, for the same reason, though less evidently, if doors and blinds enter into the construction of a house, they lose their identity as movables, though they may be lifted from their hinges without the slightest injury to the house. The vendor of these things loses his vendor's privilege, and becomes vested in its stead with a furnisher of materials' privilege." In a later part of the opinion it is further said: "Exactly under what circumstances movables are to be considered as having lost their identity is, as a matter of course, a question largely of fact."

In the Swoop Case the court held that the vendor's privilege had ceased to exist on the ground that the incorporation of the articles with the immovables belonging to defendant had destroyed their identity as movables, and that the articles had become part of an immovable by nature. This opinion was unanimous and cannot be differentiated in reasoning from the case of Carlin v. Gordy.

In Hibernia Bank & Trust Co. v. C. F. Knoll Planting & Mfg. Co., 133 La. 697, 63 So. 288, 294, the court dealing with a question, the same in principle as was involved in the Swoop Case, used this language: "The bagasse and syrup conveyor and the 15-foot piece or section of smokestack are shown to have been added to and merged in the sugar house and thereby to have become parts of an immovable to which the lien for their price does not extend"—citing the Swoop Case. The decree was unanimous.

In re Receivership of Augusta Sugar Co., 134 La. 971, 64 So. 870, 871, Payne & Joubert intervened in the proceedings, claiming a vendor's privilege on a vacuum pan, a vacuum pump, water pump, tower tank, oil storing tank, and three magna tanks which they had sold to the owner of the plantation and which had not been paid for. The existence of the privilege was contested on the same ground now urged in the cases cited. The court said: "In all cases like the present the question is, not as to whether or not the movables have become immobilized by destination, under articles 468 and 469, for they unquestionably have, but it is whether they have become so incorporated into, or merged in, the immovable property, as to have become part and parcel of it, and thereby ceased to be movables; with the consequence that the vendor's privilege upon them, qua movables, has ceased to exist. * * * The question of when or under what circumstances this merger will be held to have taken place is one to be determined from the particular facts of each case"—citing authorities. The court

then proceeded, saying: "Where the things sold are mere materials for the construction or repair of a building, or of machinery, these materials when put into the building constructed or repaired or into the repaired machinery lose their identity and become merely a part of the building or repaired machinery. In such case the vendor's privilege is lost; but out of its ashes springs another privilege, that of the furnisher of materials," etc.

In the Augusta Sugar Co. Case the privilege was recognized and enforced, although the court states, in the course of the opinion, that, in order for it to be done, it would be necessary to take down part of the wooden platform built around the vacuum pan and to take out a portion of the side of the corrugated wall of the sugar house; saying that the premises could be restored at small expense and that the vacuum pan did not lose its identity as a piece of machinery complete in itself, retaining its individuality after removal, simply because this corrugated iron building is constructed around and upon it, to protect it from the weather, or because the inexpensive wooden platform was constructed around it.

The opinion in this case recognizing the vendor's privilege was not unanimous, but the majority opinion was based on the fact that the vacuum pan and other articles had not, as a result of having been put into the sugar house for its service and made immovable by destination, become merged into the plantation and made immovable by nature. The opinion, under our appreciation, does not set up a different rule from others, in which the loss of species and merger with the plantation was found to have taken place. It was simply held in this instance that the facts showed that loss of identity and merger with and as part of an immovable by nature had not occurred.

In Milliken & Farwell v. Roger, 138 La. 823, 70 So. 848, 849, the court went over the ground again and makes the distinction which may be kept in mind, when the movable has lost its identity and ceased to be of the movable species, which it had at the time of the sale and has become, instead, part and parcel of an immovable by nature with foundation in the soil.

In the Milliken & Farwell Case, the question was whether a privilege continued to exist on "one set of housing stands, one set of stands for crusher, one gear for crusher spur, and one shaft and coupling for crusher," and whether such parts had become incorporated into the machinery of the factory on the plantation and merged into it, so as to have become simply parts of it, or retained their independent character. Discussing the case the court said: "The learned trial judge thought the latter; but we cannot agree

with him. His reason was that these parts could be separated without injury to the rest of the machinery, and that, as they were of standard make, they would not thereby be converted into mere scrap iron, but could be sold for incorporation into other machinery of the same kind. This reasoning would carry us too far. It would allow the windows and doors of a house to be lifted from their hinges, railroad rails to be removed from a railroad, or any part of standard machinery, be it even a nut or a bolt, to be removed." The court held that the facts came within the scope of the Swoop Case. There was dissent, but our understanding is that it was not from the language we have quoted.

Morgan's Louisiana & Texas Railroad & Steamship Co. v. Himalaya Planting & Mfg. Co., 143 La. 460, 78 So. 735, 736, is a case based on facts practically like the one now in hand. The lower court holds otherwise, but we differ with him on his conclusion. We quote his opinion, quoting the opinion in the suit against Himalaya Planting & Mfg. Co., as follows: "However that may be, the contract sued on had for its purpose the construction of a railroad on a plantation for the use and improvement of the plantation, and the road, when constructed, became part and parcel of the plantation, not as an immovable by destination, but as an immovable by nature." The opinion of the lower court also considers it was held, in the opinion of the Supreme Court just referred to, that the railroad on the Himalaya plantation was built by present railroad and steamship company as the result of a contract made with Himalaya Planting & Manufacturing Company, while in the present case there was no contract to construct a railroad, but only "a clear cut sale of certain specifically described movable material."

We do not find it clear that the plaintiff railroad company constructed the railroad on the Himalaya plantation. It might have been done, but, even so, it makes no difference in our opinion. The important question is, whether the steel used in the construction of the railroad on Himalaya was built into the railroad constructed thereon in such a way that the steel used ceased to be independent units of steel and became merged into a railroad, an immovable by nature, forming part of a plantation, attached thereto as part of the soil.

It seems to us that such was the controlling fact, and the court held that the rails had ceased to be movable; had become part of a railroad, an immovable by nature, and part of the Himalaya plantation, having their foundation in the soil, on which the vendor's privilege which had existed on the said rails before they were so used, ceased to exist.

In the present case the rail, angle bars, track bolts, nut locks, tie plates, spikes, frog, split switch guard rails, and low star switch sold by Morgan's Louisiana & Texas Railroad & Steamship Company to Laurel Grove Company, Inc., were, together with cross-ties and a railroad already belonging to the Laurel Grove Company, Inc., constructed by Laurel Grove Company, Inc., into a railroad having its foundation in the soil of Laurel Grove plantation. The evidence shows that ballast had been placed between the cross-ties before the rail was laid, and then, by means of the other steel parts, the rail and other parts were attached to the soil. Each thing was a different unit at the time Laurel Grove Company, Inc., acquired them, but now these things, together with cross-ties and roadbed, form a railroad, a different thing, a thing which has its foundation in the soil, to the same extent as a standing crop or tree, the sugar house and other constructions of that nature thereon. Looked at as the things were, at the time they were acquired, they are still valuable, they are not junk, and the plantation would not be seriously impaired if they were removed. But the fact is the things have no further existence as separate and independent movable units; they have become part of an immovable by nature, and, when they did so, the vendor's privilege thereon was extinguished.

For these reasons the judgment of the lower court is found to be erroneous. There should have been judgment refusing to recognize the vendor's privilege claimed by intervener and third opponent. To the extent that recognition was given and the proceeds of the steel in question ordered paid to intervener and third opponent, the judgment is erroneous.

For these reasons the judgment appealed from, to the extent that the vendor's privilege claimed by intervener and third opponent on the material that went into the railroad on Laurel Grove plantation is recognized and ordered enforced, is annulled, avoided, and set aside, and the privilege in question is denied, and it is ordered that the proceeds of the steel be paid to Vernon L. Caldwell, the mortgage creditor.

Except in the matter stated, the judgment is affirmed.

Intervener and third opponent to pay the cost in both courts.